UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-14064-CR-GRAHAM/LYNCH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EDWARD JEFF WINTER-SUAREZ
and
FRANCISCO CRUZ-RIVAS,

    Defendants.
_____/

FILED by _____ D.C.

JAN 2 0 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

**REPORT AND RECOMMENDATION ON
DEFENDANTS WINTER-SUAREZ' AND CRUZ-RIVAS'
MOTION TO SUPPRESS [D.E. #33]**

**THIS CAUSE** having come on to be heard upon the aforementioned motion and this Court having reviewed the motion, the government's response and the Defendants' reply, and having conducted an evidentiary hearing on January 15, 2009, recommends to the District Court as follows:

1. Counsel for the Defendant Winter-Suarez filed the Motion To Suppress. Counsel for Co-defendant Cruz-Rivas has filed a Motion to Adopt all pleadings in respect to the Motion To Suppress. Based upon such adoption, this Court will consider the motion, response, reply, and all evidence and arguments considered at the evidentiary hearing to apply to both defendants equally.

2. The government called one witness at the hearing, that being Senior Border Patrol Agent Delgado. Agent Delgado testified that he has eleven and one-half years experience with his agency. He has been promoted to a supervisory position in the Border Patrol Office in Laredo, Texas, since arrest of the defendants in this case.

3. Agent Delgado testified as to his expertise and training as a Border Patrol Agent. He has been an instructor at their academy and has received continuing training throughout his time as a Border Patrol Agent. He has also served as a Field Training

Officer for other officers. Agent Delgado and his agency also receive periodic updates on smuggling trends and evidence concerning other cases to serve as agency intelligence information and updates on what the Border Patrol believes are activities of alien smugglers throughout the United States.

4.  On the date in question, November 8, 2008, Agent Delgado and Agent Abbott were in separate vehicles monitoring southbound traffic on I-95 in Martin County, Florida. They began monitoring this traffic at approximately 1:00 a.m. A supervisory Border Patrol Agent was with Agent Delgado in his vehicle. His vehicle was a marked Border Patrol car. Agent Abbott's vehicle was a marked truck/SUV vehicle. Both vehicles were parked in the median shining their headlights at an angle towards oncoming traffic so as to not blind oncoming traffic.

5.  Agent Delgado testified that his agency had received recent reports from the Florida Highway Patrol as well as local sheriff's offices that they had made traffic stops at night in this area of I-95 during which they found illegal aliens within the vehicles that were stopped. Therefore, the Border Patrol decided to change their time of observation for vehicles possibly being involved in alien smuggling. This is why Agent Delgado and the other agents were conducting this activity in the early morning hours of November 8, 2008.

6.  Additionally, Agent Delgado testified that he has made thousands of stops of illegal aliens during his employment with the Border Patrol and of those, he estimates hundreds of vehicle stops involving the smuggling of aliens in the United States, both in this area, in Arizona and California, where he previously worked.

7.  At approximately 3:00 a.m. on the date in question, Agent Delgado saw a green minivan approaching with California license plates. California requires plates on the front and back of vehicles, so Agent Delgado was able to see the California license plate as the minivan approached. A photograph of the minivan was introduced into evidence as

Government's Exhibit No. 1. As the minivan passed by, Agent Delgado testified that he could tell that the driver was of Hispanic origin. Agent Delgado testified that he is Hispanic and when he looks for Hispanic drivers, he looks for people who "look like him" or have the same facial features as he does.

8.   Agent Delgado testified that I-95 is purportedly known as a "smuggling route." After seeing who he believed to be an Hispanic driver operating the green minivan with California plates, he pulled out to follow the minivan. Agent Abbott in the other vehicle did as well.

9.   Agent Delgado verified that it was a California license plate. He provided his dispatcher with the tag number and the dispatcher advised that the vehicle was registered in the Los Angeles, California area. While following the vehicle, Agent Delgado testified that he saw silhouettes of some individuals through the back window. He did not testify as to any suspicious activity concerning these silhouettes of individuals.

10.   Agent Delgado testified that based upon his experience and that of other Border Patrol agents, minivans are used by alien smugglers to maximize their profits. In other words, minivans are vehicles with the capacity for a large number of passengers so as to get as many aliens as possible into those vehicles. Also, he testified that alien smugglers routinely use Hispanic drivers to both control and communicate with the aliens who more often than not speak only Spanish.

11.   The minivan was followed for five to six miles. During that time, Agent Delgado pulled up alongside of the minivan. The driver's side window and front passenger window were not tinted, while the other windows in the minivan had a light tint. Agent Delgado could see inside the minivan and confirmed that the person driving was of Hispanic origin in his opinion and that there were several people riding as passengers.

12. He then dropped back behind the vehicle and then shortly thereafter once again drove up to the side of the minivan riding parallel with it. While riding parallel to the minivan, he shined his "takedown lights" from his light bar on top of his vehicle into the minivan. While this was being done, Agent Abbott was on the righthand side of the minivan driving parallel with it as well. In this area of I-95, it is a three lane highway in each direction. The minivan had been traveling in the middle lane which permitted Agent Delgado to approach the minivan from the left while Agent Abbott approached the minivan from the right.

13. While shining his light into the vehicle, Agent Delgado testified that neither the driver nor the passenger looked to the side. He testified that this caused him to believe that the driver was visibly nervous and raised Agent Delgado's suspicions. According to his testimony, Agent Abbott also was able to look into the minivan from his side of the vehicle while the "takedown lights" were being shined into the minivan and neither the passenger nor the driver looked over to where Agent Delgado's marked vehicle was riding parallel to the minivan. Agent Delgado testified that in his experience, when he shines his "takedown" lights into a vehicle, normally the driver and/or passenger will turn their heads and sometimes even wave at him.

14. Based upon these observations, Agent Delgado testified that he thought he had a "smuggling load" and initiated a traffic stop of the minivan. After the minivan was pulled over, he walked to the driver's side and asked the driver in English to turn the vehicle off. The driver looked as if he did not understand Agent Delgado. Therefore, Agent Delgado spoke in Spanish and directed that he turn the van off, which the driver did. The driver, later identified as the Defendant Cruz-Rivas, told Agent Delgado that he was from Mexico. There were five passengers in the minivan in addition to the driver. The Defendant Cruz-Rivas was identified in court by Agent Delgado as the driver. The

Defendant Cruz-Rivas told Agent Delgado that he was illegally in the United States as well as all of the passengers. The front seat passenger was identified in court as the Defendant Winter-Suarez. An interview of the Defendant Winter-Suarez also revealed that he admitted to being illegally in the United States.

15. On cross-examination, Agent Delgado admitted that there is a large Hispanic population in the State of Florida as well as in the State of California which could reasonably account for why an Hispanic driver would be driving a minivan in South Florida registered in the State of California. Agent Delgado was not able to estimate how many minivans he sees while on patrol during a regular shift with either multiple passengers in them or people driving on their own. Agent Delgado also admitted on cross-examination that there was nothing unusual about the minivan in particular. There were no dents in the minivan. There is no testimony concerning the minivan riding low or having tires bulging as this Court has had in previous cases. There was no testimony concerning handwriting on the rearview mirrors which in previous cases heard by this Court was submitted by the government to indicate that a minivan was purchased at a tow yard/junk yard where vehicles were regularly purchased without title and regularly utilized by alien smugglers. The photograph of the minivan, Government's Exhibit No. 1 admitted into evidence, clearly shows what appears to be a normal minivan. It is purportedly a 2004 Sienna minivan which to this Court's view looks like any other minivan which would be traveling on the highways of this area.

16. On cross-examination, it was determined that there were no observable traffic violations. Agent Delgado made it clear that his agency does not enforce traffic laws nor make traffic stops. Nevertheless, in response to questions on cross-examination, he admitted he did not observe any erratic driving or any other violations of traffic laws which called his attention to this minivan.

17.     When questioned about his suspicions concerning the van being registered in the Los Angeles, California area, he testified that he had worked in that area for approximately eight years. He testified that Los Angeles is known to law enforcement as both a destination for aliens coming into the United States and the departure area for aliens leaving to go to other parts of the United States.

18.     Neither defendant presented any witnesses or evidence at the Suppression Hearing.

## ANALYSIS

19.     This matter essentially boils down to what Agent Delgado had within his immediate view and knowledge at the time that he decided to make the immigration stop. This Court must take into consideration all of Agent Delgado's extensive training and experience which he has gained over the years in determining whether or not his observations made at the scene prior to making an immigration stop would serve as a reasonable basis for an immigration stop.

20.     The government is correct that the Court must look at the totality of all of the circumstances which would include the agent's observations as well as the agent's training, experience and intelligence information. See United States v. Arvizu, 122 S.Ct. 744 (2002). As stated by the Supreme Court in Arvizu, reasonable suspicion justifying an investigatory stop need not rule out the possibility of innocent conduct. However, the observations of the conduct observed by the agent prior to making an investigatory stop must, within their totality, justify a reasonable probability that criminal conduct, such as alien smuggling, was afoot.

21. This Court is going to go through each of the appellate cases which it finds to be pertinent in this matter. However, prior to doing so, this Court will refer to at least one of the prior cases it has considered recently involving this same issue. By way of comparison, this Court is going to set forth the conduct claimed by Agent Delgado to justify the stop in this case as compared to other cases in which Agent Delgado was involved before this Court as well as appellate decisions involving similar cases.

22. In the case of <u>United States v. Juan Jose-Andres</u>, Case No. 08-14045-CR-GRAHAM/LYNCH, this Court conducted an evidentiary hearing in respect to the Defendant's Motion To Suppress. Agent Delgado was also the agent in that case who made the immigration stop. This Court found that the factors observed by Agent Delgado were sufficient under the applicable case law to justify an immigration stop of the vehicle in question. Accordingly, this Court recommended that the Motion To Suppress in that case be denied. This Court finds that the factors in that case were markedly different from the factors observed by Agent Delgado in this case.

23. In the <u>Jose-Andres</u> case, the testimony from Agent Delgado revealed the following:

 a. An Hispanic driver who was observed to at first be calm and then visibly stiff, rigid, and sat up straight when the driver and his front seat passengers observed the marked Border Patrol vehicles alongside I-95;

 b. Neither the driver nor the front seat passengers looked over at the marked Border Patrol vehicles as they passed;

 c. There were two front seat passengers in addition to the driver in the minivan which Agent Delgado felt was unusual because he believed minivans to have only two seats, i.e., one for the driver and one for the front seat passenger, which would indicate that there were numerous other individuals in the back of the minivan;

   d. There was an Alabama license plate on that vehicle and Agent Delgado testified that intelligence from the Border Patrol was that alien smugglers were now using vehicles licensed in "states along the east coast of the United States" to throw off law enforcement looking for vehicles with plates from the southwest United States area such as California, Arizona and Texas, which have adjacent borders with Mexico;

   e. The rear window of that minivan in that case was tinted and Agent Delgado could see silhouettes of several people moving about as if "crouching down to avoid detection";

   f. While driving next to and parallel with the minivan, neither the driver nor any of the passengers turned their heads;

   g. The driver was visibly gripping the steering wheel "very tightly"; and

   h. Agent Delgado observed while riding behind the vehicle that the rear tires were bulging and the vehicle was riding very low to the ground which led him to believe that it was carrying a heavy load with as many people as possible "crammed into it" to the point of being overloaded.

   24. This Court has heard other cases involving Agent Delgado and the Border Patrol in this area in which these factors listed above were present in addition to other factors, including, but not limited to, handwriting on rearview mirrors. The testimony in another case heard by this Court was such that handwriting on rearview mirrors was consistent with intelligence information received about vehicles being purchased without titles from tow yards/junk yards and being regularly used by alien smugglers.

   25. This Court understands that there is no set list of factors which courts are to look at in determining whether or not an immigration stop is reasonable. In fact, the <u>Arvizu</u> decision specifically states that the Supreme Court was deliberately avoiding the creation of some list of specific factors which would serve to justify such an investigatory stop. The

Supreme Court in <u>Arvizu</u> stated that it would not reduce such reasonable suspicion to a "neat set of legal rules." Each case is decided on its own facts and the experience and training of the officer in question. While that is said, this Court finds that the factors observed by Agent Delgado in this case are minimal compared to the other cases this Court has heard involving similar investigatory stops and minimal compared to the factors considered by appellate courts, which this Court will review later herein. The testimony in this case indicates the factors Agent Delgado considered to justify the investigatory stop were as follows:

    a.    Minivan being driven by an Hispanic driver;

    b.    Minivans are sometimes used to smuggle illegal aliens;

    c.    Vehicle registered in Los Angeles, California which is an area where illegal aliens are smuggled into and out of;

    d.    His observations took place at 3:00 a.m. on I-95 which is a known highway used by alien smugglers; and

    e.    That the driver and the passenger appeared nervous and would not look over as the Border Patrol agents' vehicles drove parallel with them and shined lights into the minivan.

26. If this Court was to find that this investigatory stop was reasonable, then any minivan being operated by an Hispanic individual with out-of-state plates from either the southwest United States or the east coast of the United States operating on I-95 with the driver failing to look over at a vehicle driving parallel to him would be subject to a stop. Without more observable factors, this Court cannot find that such a stop is reasonable.

27. This Court believes that the factors in this case observed by Agent Delgado are very distinguishable from the factors he observed in the <u>Jose-Andres</u> case and which this Court listed above. In this case, there is no evidence that the Hispanic driver appeared

calm and then immediately became "stiff, rigid and sat up straight" upon observing the Border Patrol vehicles. There is no evidence in this case that there were more people in the front of the minivan than normally would be seen, which would lead to a reasonable conclusion that the back of the minivan was "packed" with individuals. There is no evidence that the silhouettes of the people seen through the back of the minivan were moving about or "crouching down" as if to avoid detection. There is no evidence that the driver was gripping the steering wheel "very tightly" as the Border Patrol vehicle drove parallel to it. There is no evidence that the rear tires were bulging and the minivan riding very low which would reasonably indicate that the minivan was overloaded beyond its normal capacity for passenger occupancy. Finally, there is no evidence that there is any exterior observations, such as erratic driving, speeding, speed slower than normal, the tapping of brakes, a sudden lane change when observing the marked Border Patrol vehicle or observing handwriting on rearview mirrors indicating vehicles similarly used in alien smuggling.

28.     This Court mentions these factors because these are many of the factors contained within the appellate decisions this Court is going to review. This Court knows that there is no specific list nor litany of factors which must be considered before "reasonable suspicion" justifies an immigration stop. However, this Court is referring to these other factors from cases it has heard or in appellate decisions which this Court has reviewed to serve as a comparison to the factors before the Court in this case. This Court believes that these other cases and factors set forth therein are much more extensive so as to serve as reasonable suspicion to justify an investigatory stop as compared to the minimal factors which are before the Court at this time.

29.     In United States v. Smith, 201 F.3d 1317 (11th Cir. 2000), the Eleventh Circuit found that seemingly innocuous behavior to the ordinary citizen may appear suspect

to an experienced agent. This Court does not deny that fact. The <u>Smith</u> case involved a bus check by Border Patrol agents. However in <u>Smith</u>, the agents considered the suspect's nervousness as one factor. They observed whispered conversations in the bus terminal between one suspect and the other. There appeared to be joint transportation of suitcases by the suspects making it apparent that they were traveling together. However, the individuals were seen waiting for the bus in separate locations of the bus terminal and they appeared to be attempting to conceal their association.

30.     Just as in this case, seemingly innocuous conduct could justify a reasonable search. The factors listed above by this Court from its decision in the <u>Jose-Andres</u> case clearly show many of those factors in and of themselves are innocent conduct. However, when they are taken in their totality and accumulated together, this Court found that they did serve as a justifiable basis for reasonable suspicion and an immigration stop by Agent Delgado.

31.     In <u>United States v. Cruz-Hernandez</u>, 62 F.3d 1353 (11th Cir. 1995), there was was a roving Border Patrol stop of a van. This Court notes that the <u>Cruz-Hernandez</u> case originated from this Division of this Court. The Eleventh Circuit found that failure to make eye contact cannot be considered alone in determining whether a Border Patrol agent had reasonable suspicion to stop the defendant to verify his citizenship status. The Hispanic driver, who had quickly averted his gaze when an agent looked at him and who appeared nervous, was only one factor to be considered. In <u>Cruz-Hernandez</u>, the court found that there was reasonable suspicion to stop a van. However, the circumstances and conduct observed by the agent in that case went far beyond what we have in the case before this Court.

32.     In <u>Cruz-Hernandez</u>, the court found that Florida is not in an area which shares any land border with a foreign country. Therefore, the vehicle's proximity to a land

border was much less significant for consideration. The court found that a combination of factors such as the characteristics of the area in relation to its proximity to the border, unusual traffic patterns on the road, previous experience with alien smuggling in the area, behavior of the driver such as erratic driving, characteristics of the vehicle such as being heavily loaded, and other factors can be considered by the agent in light of his experience in detecting illegal entry and smuggling such to justify an immigration stop. Once again, the Cruz-Hernandez court cited to the totality of the particular circumstances standard.

33. In particular, the agent in Cruz-Hernandez observed the following:

a. The defendant was dressed in clothes typical of undocumented aliens working in the local fields;

b. The defendant quickly averted his gaze and jerked his head to the front when the agent looked at him and seemed nervous;

c. The defendant appeared to be Hispanic;

d. The defendant was driving a van typical of those to transport large numbers of undocumented aliens to and from the fields;

e. The vehicle displayed an out-of-state plate;

f. The agent knew that many undocumented aliens lived in the local trailer park "near the location" of the stop; and

g. Local businesses and citizens had complained of undocumented aliens living in the area and working in the area fields.

34. As mentioned above, the Cruz-Hernandez case originated in this Division. This Court found reasonable the factors considered by Border Patrol Agent Zetts in making the stop in that case. The Eleventh Circuit Court of Appeals agreed with that assessment. By comparison however, the factors observed and considered by Agent Zetts in that case were far more extensive than those that the Court has before it today in this case.

35.   In <u>United States v. Tapia</u>, 912 F.2d 1367 (11th Cir. 1990), the Eleventh Circuit found that a vehicle stopped for speeding which had out-of-state plates, a driver who appeared to be Mexican, a driver who appeared to be visibly nervous and a vehicle containing just a few pieces of luggage, did not provide the minimal particularized basis for reasonable suspicion of any criminal activity. As a result, the court found that any further investigatory detention beyond writing of the traffic citation was inappropriate.

36.   All of the aforementioned cases as well as <u>United States v. Perkins</u>, 348 F.3d 965 (11th Cir. 2003), clearly establish that a stop such as this, which is similar to a <u>Terry</u> stop, only requires a reasonable suspicion. However, the factors which sufficiently make up reasonable suspicion to justify such a stop require at least some minimal level of objective justification. Any unparticularized suspicion or hunches of criminal activity being afoot are insufficient.

37.   The government cites to <u>United States v. Guerrero-Barajas</u>, 240 F.3d 428 (5th Cir. 2001), in support of its position in this case. However, the factors in <u>Guerrero-Barajas</u> are more extensive. The Fifth Circuit found that the Border Patrol agents did have reasonable suspicion sufficient to conduct an investigatory stop based upon their observations of the following activity:

    a.   That the highway being traveled was a common route and area for alien smuggling approximately 35 miles north of the Mexican border;

    b.   The stop was at 12:30 a.m. and it was the training and experience of the officers in question that "lawful vehicles" infrequently traveled in that area at that time of day;

    c.   Other investigatory stops of "low riding vehicles resulted in the seizure of illegal aliens";

    d. The vehicle in question was riding low with windows "heavily tinted"; and

    e. The driver was observed driving slow and began to swerve in his lane once the agents began to follow him.

  38. Clearly, the factors in <u>Guerrero-Barajas</u> are more significant and "suspicious" than the factors before this Court in this matter. We are not in close proximity to a border. I-95 is not a road that is "infrequently" traveled at 3:00 a.m. The vehicle was not riding low. The driver did not exhibit any erratic or evasive driving after seeing the Border Patrol agents. <u>See</u> <u>also</u> <u>United States v. Hernandez</u>, 193 Fed.Appx. 338 (5th Cir. 2006).

  39. The government also cited specifically to <u>United States v. Singh</u>, 415 F.3d 288 (2nd Cir. 2005). However, the factors observed by the Border Patrol agents in <u>Singh</u> are also much more extensive and suspicious than the conduct observed by Agent Delgado in this case. In <u>Singh</u>, the Border Patrol agents observed the following conduct:

    a. The defendant was operating a Lincoln Town Car which the agents, in that area, testified was a type of vehicle known to be favored by immigrant smugglers because of its large passenger capacity;

    b. Although the car was registered in New York, where that stop took place, the defendant was found driving on a rural road near the United States (New York State)-Canadian border in an area where illegal immigrants frequently attempted to enter the United States by hiking through the woods;

    c. The agents learned from a registration search of the vehicle that this particular vehicle had recently entered the United States from Canada;

    d. The agents observed the defendant driving very slowly along the road and tapping his brakes in a manner which they commonly believed were used as a signal to illegal immigrants that the car is available to pick them up;

  e. The defendant was seen driving to town, parking his car at a McDonald's restaurant, waiting, not getting out of the vehicle, and then leaving again;

  f. While observing the defendant's vehicle at the McDonald's, the Border Patrol dispatcher informed the agents that motion sensors along the United States-Canadian border had alerted to a crossing fifteen minutes walking distance from the defendant's prior location on the rural road;

  g. The defendant was then followed by Border Patrol agents back to that same location on the rural road where the border sensors had just been activated; and

  h. The agents then observed the defendant drive toward another remote location near the United States-Canadian border and then return with passengers from a rural area.

  40. At that point, the agents believed that they had sufficient factors within their knowledge combined with their law enforcement intelligence and experience to justify a stop. The Second Circuit Court of Appeals agreed. This Court would agree if those factors were present before the Court. However, those factors in <u>Singh</u> are much more detailed indications of suspicious conduct than the factors presently before this Court.

  41. In summary, the observations in this case by Agent Delgado of an Hispanic driver lawfully operating a minivan from California on I-95 who did not look off to the side, and even may have appeared to be nervous, did not justify an immigration stop. In this factual situation the factors observed by Agent Delgado taken in their totality and combined with his background and experience are insufficient to justify even a temporary detention and investigatory stop.

  **ACCORDINGLY**, this Court recommends to the District Court that the Motions To Suppress [D.E. #33] be **GRANTED**.

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Donald L. Graham, United States District Judge assigned to this case.

**DONE AND SUBMITTED** this 20th day of January, 2009, at Ft. Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

cc:
Hon. Donald L. Graham
AUSA Jennifer Millien
AFPD Fletcher Peacock
Thomas R. Garland, Esq.